IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| DEBRA BREWSTER, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 6:16-cv-00170-RP-JCM |
| | § | |
| CUSTOM DATA SYSTEMS, INC., | § | |
| WARDLAW CLAIMS SERVICE, LLC, | § | |
| WILLIAM F. WARDLAW, | § | |
| MICHAEL N. WARDLAW, and | § | |
| JEFFREY A. KEAHEY | § | |
| Defendants. | § | JURY DEMANDED |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TO THE HONORABLE JUDGE OF THIS COURT:**

Pursuant to Fed. R. Civ. P. 56, Defendants Custom Data Systems, Inc., Wardlaw Claims Service, LLC, William F. Wardlaw, Michael N. Wardlaw, and Jeffrey A. Keahey (collectively referred to as "Wardlaw" or "Defendants") move for summary judgment (the "Motion") on their affirmative defense that Plaintiff Debra Brewster ("Brewster") was an exempt administrative employee, and in support respectfully show:

## I.  FACTUAL BACKGROUND

1.     Plaintiff alleges that at all relevant times, she was a non-exempt employee entitled to an overtime compensation premium for hours worked over 40 hours per work week.

2.     Defendants allege, *inter alia*, that Plaintiff was employed by Defendant Custom Data Systems, Inc. in a bona fide administrative capacity and, therefore, was an exempt employee as to the overtime pay requirements under the Fair Labor Standards Act ("FLSA") in accordance with 29 U.S.C. 213.

3.     Plaintiff was employed by Defendant Custom Data Systems, Inc. in the position of administrative supervisor, although Plaintiff alleges in her complaint that she was really an administrative assistant.

4.     It is undisputed that Plaintiff was compensated on a salary or fee basis at a rate not less than $455 per week.

5.     It is also undisputed that Plaintiff's primary duty was the performance of office or non-manual work directly related to the management or general business operations of Wardlaw or the Wardlaw's customers.

6.     Plaintiff's "primary job function was to handle escalated calls, customer concerns, convey information to customers that might have questions or issues. She coordinated with [Wardlaw's] clients to set up data feeds to and from. She would answer questions for [Wardlaw's] clients. She would offer support to [Wardlaw's] field management team. She would define systems by which [Wardlaw] would receive and send data to and from clients and then pass that on to IT for automation or a manual team, data entry team. She did some data entry. She answered FNOL phone calls, first notice of loss." (*See* Exhibit E—Jeffrey Keahey Dep., 39:4-17; *See also* Exhibit B—Stephen Brewster Dep., 10:19-25, 11:1-10, 24:17-25, 25:1-4; *See also* Exhibit C—Affidavit of Crystal Bell. ¶ 2).

7.     Plaintiff's primary duty included the exercise of discretion and independent judgment with respect to matters of significance. (*See* Exhibit B—Stephen Brewster Dep., 18:6-25, 19:1-4, 37:20-25, 38:1-25, 39:1-16, 49:15-24).

8.     Accordingly, at all relevant times, Plaintiff was an exempt employee and not entitled to an overtime compensation premium.

## II. SUMMARY JUDGEMENT EVIDENCE

9.      Exhibit A—Excerpts of Deposition Testimony of Debra Brewster

10.     Exhibit B—Excerpts of Deposition Testimony of Stephen Brewster

11.     Exhibit C—Affidavit of Crystal Bell

12.     Exhibit D—Defendants' Answers to Plaintiff's First Set of Interrogatories

13.     Exhibit E—Excerpts of Deposition Testimony of Jeffrey Keahey

## III. SUMMARY JUDGEMENT STANDARD

14.     Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. An issue is not genuine if the trier of fact could not, after an examination of the record, rationally find for the non-moving party. *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The burden of demonstrating that no genuine issue of material fact exists lies with the party moving for summary judgment. *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986).

## IV.     SUMMARY JUDGMENT GROUNDS

15.     Defendants move for summary judgment on the ground that Plaintiff was employed by Defendant Custom Data Systems, Inc. in a bona fide administrative capacity and, therefore, was an exempt employee as to the overtime pay requirements under the FLSA.

## V.     ARGUMENT AND AUTHORITIES

16.     To prevail in this Motion, Defendants must establish (A) that Plaintiff was compensated on a salary or fee basis at a rate not less than $455 per week; (B) that Plaintiff's primary duty was the performance of office or non-manual work directly related to the management or general business operations of Wardlaw or the Wardlaw's customers; and (C)

that Plaintiff's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200.

>   **A.**     **It is undisputed that Plaintiff was compensated on a salary basis at a rate not less than $455 per week.**

17.     This first element is not in dispute. Both Plaintiff and her husband, Steve Brewster, testified in their depositions that Plaintiff was paid on a salary basis in excess of $455 per week. (*See* Exhibit A—Debra Brewster Dep. Vol. 2, 56:3-4; *see also*, Exhibit B—Steve Brewster Dep. 42: 25, 43:1-5; *see also*, Exhibit C—Affidavit of Crystal Bell para. 3).

18.     Accordingly, the first element of the FLSA administrative exemption has been satisfied.

>   **B.**     **It is undisputed that Plaintiff's primary duty was the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers.**

19.     "The phrase 'directly related to the management or general business operations' refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).

20.     Wardlaw engages in the business of providing insurance claims services to its clients, which are insurance companies.

21.     It is undisputed that Plaintiff did not perform any work on a manufacturing production line, nor did she sell any service provided by Defendants.

22.     Rather, Plaintiff performed work directly related to assisting with the running or servicing of the business of Wardlaw and its customers.

23.     More specifically, Plaintiff "handle[d] escalated calls, customer concerns, convey[ed] information to customers that might have questions or issues. She coordinated with [Wardlaw's] clients to set up data feeds to and from. She would answer questions for [Wardlaw's] clients. She would offer support to [Wardlaw's] field management team. She would define systems by which [Wardlaw] would receive and send data to and from clients and then pass that on to IT for automation or a manual team, data entry team. She did some data entry. She answered FNOL phone calls, first notice of loss." (See Exhibit E—Jeffrey Keahey Dep., 39:4-17; *See also* Exhibit B—Stephen Brewster Dep., 10:19-25, 11:1-10, 24:17-25, 25:1-4; *See also* Exhibit C—Affidavit of Crystal Bell. ¶ 2).

24.     The duties performed by Plaintiff, as described in the preceding paragraph, were in the management or general business operations of Wardlaw and its clients.

25.     Accordingly, the second element of the FLSA administrative exemption has been satisfied.

**C.      Summary judgment evidence establishes that Plaintiff's primary duty included the exercise of discretion and independent judgment with respect to matters of significance.**

26.     "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a).

27.     The Court must determine whether Plaintiff's primary duty involved the performance of exempt work. *Altemus v. Fed. Realty Inv. Trust*, 490 F. App'x 532, 537 (4th Cir. 2012); 29 C.F.R. § 541.700(a).

28.    "…The term 'primary duty' means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." 29 C.F.R. § 541.700(a).

29.    In this case, Plaintiff will argue that her primary duty was the performance of menial, clerical tasks; however, the record is clear that even if Plaintiff did perform some work that could be classified as nonexempt, the amount of time spent, and the relative importance of exempt work performed, far outweighed any nonexempt work that she may have performed. The work actually performed by Plaintiff required much more knowledge, experience, and the exercise of discretion and independent judgment than simply the performance of menial, clerical tasks.

30.    When determining whether an employee exercises discretion and independent judgment with respect to matters of significance, the Court should consider several factors, including but not limited to the following, "whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree…; whether the employee provides consultation or expert advice to management… whether the employee investigates and resolves matters of significance on behalf of management." 29 C.F.R. § 541.202(b).

31.     Plaintiff did carry out major assignments in conducting the operations of the business. In particular, "[s]he would define systems by which [Wardlaw] would receive and send data to and from clients and then pass that on to IT for automation or a manual team." (*See* Exhibit E—Jeffrey Keahey Dep., 39:12-14). Stated differently, when Wardlaw would contract with a new client (insurance company), Plaintiff would work with that new client to establish the process by which Wardlaw would receive and handle claims for that new client. This defining of new systems was of paramount importance to the operations of the business of Wardlaw.

32.     Plaintiff also performed work that affected Wardlaw's business operations to a substantial degree. The business of Wardlaw is very service-intensive. It is imperative that Wardlaw provides unparalleled service to its clients or it will risk losing those relationships. Understanding the importance of interaction with its clients, Plaintiff was given the responsibility to use her judgment and discretion to manage communications with those clients as she saw fit. (*See* Exhibit B—Stephen Brewster Dep., 39:4-16).

33.     A significant part of Plaintiff's job was to handle escalated phone calls from Wardlaw's clients (insurance companies) or an insured of Wardlaw's clients. Escalated phone calls are "escalated" in the sense that if the initial call center representative could not adequately address the concerns of the caller, the call would be escalated to someone who could adequately help the caller. Plaintiff was the first level of escalation from the call center. (*See* Exhibit E—Jeffrey Keahey Dep., 46:20-25, 47:1-25, 48:1-25, 49:1-25, 50:1-25, 51:1-17).

34.     Because Plaintiff was a licensed adjuster, and had more knowledge and experience that other call center representatives, certain questions were escalated to Plaintiff, including but not limited to those calls related to policy coverage or specific details about an

estimate.  (*See* Exhibit E—Jeffrey Keahey Dep., 47:4-20, 117:8-25, 118:1-25, 119:1-11).

35.    It is also for these reasons (Plaintiff's advanced knowledge, experience, and licensing) that Plaintiff was provided with the company cell phone and answered after-hours phone calls. (*See* Exhibit A—Debra Brewster Dep. Vol. 1, 14:21-25, 15:1-3).

36.    No nonexempt employee was issued a company cell phone. Instead, Plaintiff, an exempt employee, was issued a company cell phone because she had the advanced knowledge, experience, and licensing necessary for her to exercise the discretion and independent judgment that was required to field after-hours phone calls.

37.    Plaintiff also investigated and resolved matters of significance and provided consultation to management. Specifically, after taking a call, typically from an insured, contractor or public adjuster, Plaintiff "could reopen a claim to an adjuster, reassign a claim. [She] could work with management to coordinate… further contact with a contractor or a public adjuster or an attorney." (*See* Exhibit E—Jeffrey Keahey Dep., 50:19-25, 51:1-2).

38.    "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision… The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action..." 29 C.F.R. § 541.202(c).

39.    Plaintiff performed her duties free from immediate direction or supervision, which constitutes the exercise of discretion and independent judgment.

40.    For example, from time to time, Plaintiff would recieve the first notice of loss of a claim after business hours. In that event, Plaintiff would make the determination as to whether it was necessary to enter such claim right away or whether the entry of the claim could wait until

the following morning. (*See* Exhibit B—Stephen Brewster Dep., 37:20-25, 38:1-15).

41.     Similarly, from time to time, Plaintiff would receive emails from a client after business hours. In that event, Plaintiff would make the determination as to whether it was necessary to handle the email right away or wait until the following morning. (*See* Exhibit B—Stephen Brewster Dep., 39:4-16).

42.     The foregoing establishes that the primary duty performed by Plaintiff was exempt work rather than nonexempt work. Plaintiff had more advanced knowledge, training and licensing than nonexempt Wardlaw employees. Wardlaw took advantage of Plaintiff's advanced knowledge, training and licensing by giving her more advanced duties and responsibilities.

43.     Plaintiff was also paid a salary that was commensurate with her level of responsibility. Her salary was nearly twice that of other nonexempt employees. *See* Exhibit C—Affidavit of Crystal Bell. ¶¶ 3—5).

44.     "To determine whether an employee's 'primary duty' involves the performance of exempt work, the implementing regulations list a number of factors to consider, including 'the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.'" *Altemus v. Fed. Realty Inv. Trust*, 490 F. App'x 532, 537 (4th Cir. 2012) (citing 29 C.F.R. § 541.700(a)).

45.     In this case, based on Plaintiff's elevated duties and responsibilities in conjunction with the significantly higher salary paid to Plaintiff as compared to other employees for the kind of work performed by Plaintiff, Plaintiff's primary duty was clearly exempt work as opposed to non-exempt work.

46.     Finally, "[a]lthough salary alone is not dispositive under the FLSA, [courts  have noted] that the 'FLSA was meant to protect low paid rank and file employees' and that '[h]igher

earning employees… are more likely to be bona fide managerial employees.'" *Darveau v. Detecon, Inc.*, 515 F.3d 334, 338 (4th Cir. 2008) (citing *Counts v. S.C. Elec. & Gas Co.*, 317 F.3d 453, 456 (4th Cir. 2003)).

47.     Neither her compensation, nor her duties and responsibilities suggest that Plaintiff was a low paid rank and file employee that the FLSA was intended to protect. Rather, the facts and evidence demonstrate that Plaintiff was employed by Defendant Custom Data Systems, Inc. in a bona fide administrative capacity and, therefore, was an exempt employee as to the overtime pay requirements under the FLSA.

## V.     CONCLUSION AND REQUEST FOR RELIEF

48.     For the foregoing reasons, Plaintiff is not entitled to an overtime compensation premium because she was employed by Defendant Custom Data Systems, Inc. in a bona fide administrative capacity and, therefore, was an exempt employee as to the overtime pay requirements under FLSA.

THEREFORE Defendants request that the Court grant Defendants' Motion for Summary Judgment, and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

SHEEHY, LOVELACE & MAYFIELD, P.C.

　　　　/s/ *David M. Mathews*　　　　
David M. Mathews     #24058211
*dmathews@slmpc.com*
Philip E. McCleery     #13395000
*pmccleery@slmpc.com*
510 N. Valley Mills, Suite 500
Waco, TX 76710
254.772.8022 Telephone
254.772.9297 Facsimile

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that on the 15th day of June, 2017, a true and correct copy of this Motion for Summary Judgment was sent via email to all counsel of record.


   /s/ *David M. Mathews*
David M. Mathews

# Exhibit "A"

Debra Brewster                                           January 11, 2017

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

DEBRA BREWSTER,                §
                               §
         Plaintiff,            §
                               §
vs.                            § Civil Action No.
                               § 6:16-cv-00170-RP-JCM
                               §
                               §
CUSTOM DATA SYSTEMS,           §
INC., WARDLAW CLAIMNS          §
SER ICE, LLC, WILLIAM F.       §
WARDLAW, MICHAEL N.            §
WARDLAW, and JEFFREY A.        §
KEAHEY,                        §
                               §
         Defendants.           §
------------------------------------------------------

ORAL DEPOSITION OF

DEBRA J. BREWSTER

JANUARY 20, 2017

------------------------------------------------------

     ORAL AND VIDEOTAPED DEPOSITION OF DEBRA J.

BREWSTER, produced as a witness at the instance of

the DEFENDANTS, and duly sworn, was taken in the

above-styled and numbered cause on JANUARY 20, 2017,

from 10:24 a.m. to 11:23 a.m., before Melody Reneé

Campbell, CSR in and for the State of Texas,

reported by method of machine shorthand, at the Law

Offices of 510 North Valley Mills Drive , Waco,

Texas, pursuant to the Federal Rules of Civil

Procedure.

Page 2

```
1                A P P E A R A N C E S

2      FOR THE PLAINTIFF:
              Mr. Kerry O'Brien, Esq.
3             O'Brien Law Firm
              1011 Westlake Drive
4             Austin, Texas  78746
              512.410.1960
5             KO@obrienlawpc.com

6

7      FOR THE DEFENDANTS:
              Mr. Philip E. McCleery, Esq.
8             Mr. Davie Michael Mathews, Esq.
              Sheehy, Lovelace & Mayfield
9             510 North Valley Mills Drive, Suite 500
              Waco, Texas 76710
10            254.772.8022
              254.772.9297` (Fax)
11            PMcCleery@slmpc.com
              DMathews@slmpc.com
12

13

14     ALSO PRESENT:
              Mr. Jeffrey A. Keahey
15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
1                    I N D E X
                                              PAGE
2  EXAMINATION
       BY MR. McCLEERY.............................  4
3
   CHANGES AND SIGNATURE.......................... 37
4
   REPORTER'S CERTIFICATION....................... 38
5

6
                  E X H I B I T S
7  NO.  DESCRIPTION                            PAGE

8   1  Notice                                    4

9   2  g Email Log                              19

10  3  Transactions List                        28

11

12                  *-*-*-*-*

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Debra Brewster                                              January 11, 2017

                                                                Page 4
 1              (Exhibit Number 1 marked.)

 2                  DEBRA J. BREWSTER,

 3     having been first duly sworn, testified as follows:

 4                        EXAMINATION

 5     BY MR. McCLEERY:

 6         Q.   Ms. Brewster, I've handed your lawyer an

 7     exhibit.  All that is is a notice of this deposition

 8     today.  You know about it because you're here.

 9         A.   Yes.

10         Q.   Okay.  Would you state your name for the

11     record, please.

12         A.   Debra J. Brewster.

13         Q.   And I'm Philip McCleery.  With me is David

14     Mathews, the attorneys for the defendants in this

15     case, and one of the defendants, Jeff Keahey.

16              Have you had your deposition taken

17     before, ma'am?

18         A.   No.

19         Q.   Okay.  You've had an opportunity to discuss

20     with Mr. O'Brien what we'll be doing here today?

21         A.   Yes.

22         Q.   Okay.  Of course, I'm going to be asking

23     questions.  The court reporter is taking down my

24     questions and your answers, and your answers are

25     under oath.  Okay?  I'm going to ask, during the

```
                                        Page 14
 1    monitoring e-mails, monitoring claims, phone calls
 2    from insureds.
 3              If I was able to answer, I would; if I
 4    couldn't, I would take the message.  And if I had --
 5    I'd send out an e-mail to whoever need to -- it
 6    needed to go to, with the information from the
 7    message.
 8         Q.   What -- you did these duties at home?
 9         A.   Yes.
10         Q.   Did you do these same duties at work, at
11    the office?
12         A.   Yes.
13         Q.   Did you perform any duties when you were
14    neither at home or at the office?
15         A.   Yes.
16         Q.   Tell us about what duties you did when you
17    were not at home or at the office.
18         A.   Answer the phone.
19         Q.   Anything else?
20         A.   No.
21         Q.   In connection with the performance of your
22    job you've mentioned answering the phone.  Correct?
23         A.   Uh-huh.
24         Q.   Was that a cell phone?
25         A.   Yes.
```

                                                    Page 15

     1          Q.    Was that a cell phone that was provided by

     2     Wardlaw?

     3          A.    Yes.

     4          Q.    Okay.  You obviously had access to a

     5     computer?

     6          A.    Yes.

     7          Q.    And you had an e-mail account where you

     8     used the Wardlaw e-mail account?

     9          A.    Yes.

    10          Q.    The latter?  You didn't use your own

    11     e-mail?

    12          A.    No.  I used the Wardlaw e-mail.

    13          Q.    Strictly Wardlaw?

    14          A.    Yes.

    15          Q.    And the computer you used was the -- was a

    16     Wardlaw computer?

    17          A.    One of them was.

    18          Q.    What others did you have?

    19          A.    I had one of my own and they had paid for

    20     the one that I had at home.  The one I had in the

    21     office, I actually had paid for.

    22          Q.    Okay.  You had a computer you were provided

    23     at the office?

    24          A.    Yes.

    25          Q.    And which you used to do your work?

```
 1              UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
 2                    WACO DIVISION

 3  DEBRA BREWSTER             *
                              *
 4  VS.                        *
                              *  CIVIL ACTION
 5  CUSTOM DATA SYSTEMS, INC.,  *  NO. 6:16-cv-00170-RP-JCM
    WARDLAW CLAIMS SERVICE, LLC, *
 6  WILLIAM F. WARDLAW,        *
    MICHAEL N. WARDLAW, and    *
 7  JEFFREY A. KEAHEY          *

 8                  ORAL DEPOSITION OF
                     DEBRA BREWSTER
 9               (VOLUME 2 OF 2 VOLUMES)
```

10   a witness in the above entitled and numbered cause,

11   taken by the Defendants, before Teresa A. Easter, a

12   Certified Shorthand Reporter in and for the State of

13   Texas, on the 24th day of March, 2017, from 10:19 a.m.

14   to 1:05 p.m., at the Law Offices of Sheehy, Lovelace &

15   Mayfield, P.C., located at 510 North Valley Mills Drive,

16   Suite 500, in the City of Waco, County of McLennan, and

17   State of Texas, in accordance with the Federal Rules of

18   Civil Procedure and the attached Agreement.

19

20

21

22

23

24

25

1                          INDEX

2              Oral Deposition of DEBRA BREWSTER

3   Examination by Mr. McCleery ----------------------    3
    Further Examination by Mr. O'Brien ---------------   81
4   Further Examination by Mr. McCleery --------------   87

5

6                         EXHIBITS

7   No.:     Description                       Page No.:

8   4        Notice of Intention to Take Oral
             Deposition of Debra Brewster ------------    3
    5        Debra Brewster Overtime Computations ----    3
9   6        Bates DEF0020 through DEF0030 -----------   31
    7        Bates DEF0197 through DEF0202 -----------   34

10

11                       APPEARANCES

12  FOR THE PLAINTIFF:

13
        Kerry O'Brien, Esq.
14      O'BRIEN LAW FIRM
        1011 Westlake Drive
15      Austin, Texas 78746
        512-410-1960
16      512-410-6171 Fax
        ko@obrienlawpc.com
17
    FOR THE DEFENDANTS:
18
        Philip E. McCleery, Esq., and David M. Mathews, Esq.
19      SHEEHY, LOVELACE & MAYFIELD, P.C.
        510 North Valley Mills Drive, Suite 500
20      Waco, Texas 76710
        254-772-8022
21      254-772-9297 Fax
        pmccleery@slmpc.com
22      dmathews@slmpc.com

23  ALSO PRESENT:

24      Jeffrey A. Keahey

25

```
 1                   (Exhibit Nos. 4 and 5 marked)

 2              THE REPORTER:  Beginning of deposition.

 3   The time is 10:19 a.m.

 4                   DEBRA BREWSTER,

 5   having been first duly sworn, testified as follows:

 6                   EXAMINATION

 7   BY MR. McCLEERY:

 8      Q.   Good morning again, Ms. Brewster.

 9      A.   Good morning.

10      Q.   We started this deposition a number of weeks

11   ago and for various reasons it has been continued until

12   today.

13      A.   Right.

14      Q.   Have you had an opportunity to review a

15   transcript of the portion of the deposition that was

16   taken earlier?

17      A.   No.

18      Q.   Okay.  Just to basically go over the rules, my

19   questions and your answers will be taken down by the

20   court reporter.

21      A.   Uh-huh.

22      Q.   And your answers are under oath.

23      A.   Correct, yeah.

24      Q.   Okay.

25      A.   Okay.
```

1   Wardlaw.

2        A.   Correct.

3        Q.   You received a salary, correct?

4        A.   Yes, correct.

5        Q.   And you received a W-2 at the end of the year?

6        A.   Correct.

7        Q.   Okay.  But you did not receive overtime pay.

8        A.   Correct.

9        Q.   Did you understand that you did not because you

10  were treated as an exempt employee?

11       A.   I just assumed it was because I was a salaried

12  person and that's how it worked.

13       Q.   Okay.  You never had a discussion with

14  Mr. Brewster about this.

15       A.   At one point, yes.

16       Q.   What was the discussion?

17       A.   He explained to me that given my job duties I

18  should have been paid overtime.

19       Q.   When did he explain that to you?

20       A.   I can tell you exactly when.  About probably a

21  year and a half before my termination it was finally

22  explained to me.  I don't know if the laws had changed

23  or what, but about a year and a half.

24       Q.   Okay.  You had a discussion of this about a

25  year and a half before your employment with Wardlaw

# Exhibit "B"

```
                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
                            WACO DIVISION

DEBRA BREWSTER,                     §
                                    §
              Plaintiff,            §
                                    §
VS.                                 §    CIVIL ACTION NO.
                                    §    6:16-cv-00170-RP-JCM
                                    §
CUSTOM DATA SYSTEMS, INC.,          §
WARDLAW CLAIMS SERVICE, LLC,        §
WILLIAM F. WARDLAW,                 §
MICHAEL N. WARDLAW,                 §
and JEFFREY A. KEAHEY,              §
                                    §
              Defendants.           §    JURY DEMANDED


-----------------------------------------------------------

                        ORAL DEPOSITION OF

                    STEPHEN DOUGLAS BREWSTER

                          MAY 31, 2017

                         VOLUME 1 OF 1

-----------------------------------------------------------
```

         ORAL DEPOSITION OF STEPHEN DOUGLAS BREWSTER,

produced as a witness at the instance of the Defendants and

duly sworn, was taken in the above-styled and numbered cause

on the 31st day of May, 2017, from 10:28 a.m. to 12:35 p.m.

before Terri L. Edwards, Certified Shorthand Reporter in and

for the State of Texas, reported by machine shorthand at the

law offices of Sheehy, Lovelace & Mayfield, P.C., 510 North

Valley Mills Drive, Suite 500, Waco, Texas 76710, pursuant

Page 2

 1    to the Federal Rules of Civil Procedure and the provisions

 2    stated on the record or attached hereto.

 3

 4                    A P P E A R A N C E S

 5    FOR THE PLAINTIFF:
           MR. KERRY V. O'BRIEN
 6         O'BRIEN LAW FIRM
           1011 Westlake Drive
 7         Austin, Texas 78746
           Telephone: 512.410.1960
 8         Fax: 512.410.6171
           Email: ko@obrienlawpc.com
 9
      FOR THE DEFENDANTS:
10         MR. DAVID M. MATHEWS and MR. PHILIP E. McCLEERY
           SHEEHY, LOVELACE & MAYFIELD, P.C.
11         510 North Valley Mills Drive
           Suite 500
12         Waco, Texas 76710
           Telephone: 254.772.8022
13         Fax: 254.772.9297
           Email: dmathews@slmpc.com
14
      ALSO PRESENT:
15         Jeffrey A. Keahey

16

17

18

19

20

21

22

23

24

25

Stephen Douglas Brewster                   1                   May 31, 2017

Page 3

1                            INDEX

2                                                        Page

3    Appearances ....................................... 2

4    STEPHEN DOUGLAS BREWSTER
          Examination by Mr. Mathews ..................... 4
5
     Changes and Signature ............................. 82
6
     Court Reporter's Certificate ...................... 84
7

8

9

10                          EXHIBITS

11   NO. IDENTIFICATION

12    1  Plaintiff's Original Complaint and Jury Demand ... 30

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1            (All parties present have hereby waived the

2            necessity of the reading of the statements

3            by the deposition officer as required by

4            Rule 30(b)(5).)

5            STEPHEN DOUGLAS BREWSTER,

6    having been first duly sworn, testified as follows:

7                        EXAMINATION

8    BY MR. MATHEWS:

9        Q    Mr. Brewster, my name's Dave Mathews, and I

10   represent all of the Defendants in this case.  You

11   understand that?

12       A    Yes.

13       Q    Could you please state your name for the record?

14       A    Stephen Douglas Brewster.

15       Q    And the Plaintiff in this case is Debra Brewster.

16   She's your wife, correct?

17       A    Correct.

18       Q    How long have you been married to Mrs. Brewster?

19       A    Since 2009, June 16th.

20       Q    And for all relevant times relevant to her claims

21   in this lawsuit, you were married and you were working

22   together at Wardlaw, correct?

23       A    Yes, and actually prior to.  I think prior to her

24   taking this position we were married or we were together

25   before we actually not married.

Page 10

1    works with two or three carriers.  But that management

2    structure reported to me, yes.

3        Q    Now, in the process of the discovery in this

4    case, and specifically in Mrs. Brewster's deposition, she

5    had made reference to a management team.  Is that what

6    she's referring to, the management -- is the management

7    team that she is referring to the managers that you're

8    speaking of right now?

9        A    Yes.

10       Q    And how many managers were there during the

11   course of the three years prior to her filing this lawsuit?

12       A    Without me counting, off the top of my head, 12,

13   15, somewhere in that ballpark.

14       Q    Do you mean there were as many as 15 and as few

15   as 12, or turnover over the course of that time frame,

16   there could have been 12 to 15?

17       A    Throughout that time period 12 to 15 I believe

18   would be a correct number.

19       Q    And are you familiar, I guess, either as her

20   husband or as the vice president of operations with

21   Mrs. Brewster's duties and what she -- job duties in her

22   work at Wardlaw?

23       A    Not a hundred percent but fairly familiar --

24       Q    Okay.

25       A    -- yes.

Page 11

```
 1      Q    And can you describe for the court -- when she

 2   says that she would assist the management team, can you

 3   describe what she means by that?

 4              MR. O'BRIEN:  Objection, form.

 5      A    It would encompass anything from carrier emails,

 6   input of claims, following up with adjuster issues that a

 7   manager may approach her to.  There's just a lot of

 8   interaction between carriers that she worked directly with

 9   that she managed and input that claims information into the

10   system.

11      Q    And when you say "carriers," we're talking about

12   insurance carriers, correct?

13      A    Correct.

14      Q    Insurance carriers that were clients of Wardlaw

15   that hired Wardlaw to adjust claims.  Is that accurate?

16      A    That's accurate.

17      Q    Approximately how many clients or carriers did

18   Wardlaw deal with during the time frame we're talking

19   about?

20      A    Eight to ten active.

21      Q    That answer implies that there are some inactive.

22   Is that accurate?

23      A    Yeah.  We actually had, you know, some carrier

24   accounts that were probably still considered active on the

25   books that we hadn't received claims from in a considerable
```

Page 18

1    all levels of employment are going to have to make business

2    decisions at times as far as whether this is something

3    that's within my job parameter or whether I need to

4    escalate this to -- this is -- a manager should be

5    answering this question.

6         Q    And to say that differently, all levels of

7    employees are going to have to use their discretion --

8         A    Correct.

9         Q    -- and determine how best that issue, whatever it

10   is, needs to be handled --

11        A    Correct.

12        Q    -- including Mrs. Brewster.  She would've had to

13   have made these discretionary judgment calls as to what to

14   do with a particular issue that came to her.

15        A    Correct.

16        Q    Describe for the court some of those

17   discretionary calls that Mrs. Brewster would've had to have

18   made?

19        A    I'm thinking here.  I really did not sit with her

20   that often to be able to see exactly what she did all the

21   time to know when a discretionary call was coming across.

22   My guess is -- would be an escalation from an insurance

23   carrier that they're getting no response from an adjuster,

24   that they're -- that they're needing assistance with a file

25   and she's going to have to make a decision, if they're

Page 19

1    emailing her direct, where do I go with this?  Is this

2    something I can pick up the phone and get the adjuster to

3    respond and handle myself, or is it something I need to

4    escalate to a manager?

5         Q    And let's talk about that term "escalation."

6         A    Uh-huh.

7         Q    Mrs. Brewster, in the three years prior to her

8    filing this lawsuit, worked primarily in the call center

9    area in Wardlaw; is that correct?

10        A    As far as geographic location in a building, the

11   call center area would have been probably about the last

12   year to year and a half because that was about the time it

13   was built and constructed -- prior to that there were some

14   individual office locations -- but generally the

15   administrative building.

16        Q    Okay.  And let's talk about that just to clarify.

17   There are -- when I say "call center," what is your

18   understanding?  I mean is that a correct phrase to use in

19   terms of how Wardlaw functioned?

20        A    You know, we -- we really didn't have a

21   designation for the room, per se, that she was actually

22   working in that you may designate as call center.  There

23   was a call center there.  That's where the call center

24   folks were.  That's also where the process team was.  At

25   times there was reviewers in there and/or supervisors,

Page 24

1    could not answer.  That would be an example of something

2    that Maria needed to escalate.  Is that accurate?

3         A    Yes.

4         Q    And who is the first person that Maria would go

5    to to escalate that issue that she couldn't deal with?

6         A    Depends on what the issue was, whether it was

7    another phone person, whether it was Debbie, another person

8    within the -- you know, the immediate cubicles there, the

9    phone center, that could help answer the question or

10   whether it needed to go to management to get the question

11   answered.

12        Q    All right.  You'd said call center personnel.  We

13   talked about them just now.  You'd also said processors

14   were in that geographic area, I believe, of the building.

15   Is that right?

16        A    Correct.

17        Q    In your opinion, based on your understanding of

18   Mrs. Brewster's job duties, would she qualify or be

19   categorized as a processor?

20        A    Would she be --  Say -- repeat that.

21        Q    Was Mrs. Brewster -- you'd said she wasn't -- she

22   wasn't the same as these call center personnel.

23        A    She had more duties than your typical call center

24   person, yes.

25        Q    So she did some of the call center duties, but

Page 25

1    she had more duties than a typical call center person?

2         A    Correct.

3         Q    Did she have any of the same duties as a

4    processor?

5         A    I don't believe so.

6         Q    What were the duties of a processor, just so I

7    can know?

8         A    The processors were -- it was kind of a term put

9    on them that they were really the support and back up to

10   Homesite for -- for getting all the data into Homesite

11   Claims Management System, for basically pulling that

12   information out of Wardlaw's Catapult system, moving it

13   over to Homesite's Claim System, keying up payments and so

14   forth.  They worked directly with Homesite.

15        Q    But Mrs. Brewster, you have no question in your

16   mind, was not a processor?

17        A    I don't believe so.

18        Q    Okay.

19        A    I don't believe that she ever assisted in that

20   that I'm aware of.

21        Q    All right.  Now, I'm going to embarrass myself a

22   little here.  I'd written down -- you'd said four different

23   groups of people, types of people were in that same

24   geographic area.  One was call center personnel.  One was

25   processor.  One was supervisors.  The third one I've

Stephen Douglas Brewster                          1                          May 31, 2017

                                                                    Page 37

1    with customer service, with -- how quickly they'll work the

2    claim.  One SLA may be that you have seven days.  The

3    expectation is you'll work our claims within seven days, or

4    the expectation is you'll work our claims within ten days,

5    given, you know, that weather cooperated, insured

6    cooperated.  It's more -- most of the SLAs are more

7    specific to field operations and not granular to the fact

8    that you'll enter it, input it this way, no.

9         Q    So if a claim was received after business

10   hours --  And define "after business hours."  Is it five

11   o'clock?

12        A    Well, that varied every day.

13        Q    Is "after business hours" defined anywhere, to

14   your knowledge, like in an SLA or in a contract with the

15   client?

16        A    Not that I'm aware of, no.

17        Q    So "after business hours" is generally after you

18   go home from work?

19        A    Correct.

20        Q    Okay.  If a claim is received after business

21   hours, from what I hear you say -- and correct me if I'm

22   wrong -- there is no contract or there's nothing that says

23   that it has to be entered that night; it could wait until

24   the next morning to be entered?

25        A    Correct in some, yes.

Page 38

1      Q    So if Mrs. Brewster received a claim after

2  business hours, she could within her discretion decide that

3  she thought it was important enough to enter that claim

4  right away?

5      A    Yes.

6      Q    And she did make that decision from time to time,

7  correct?

8      A    I would assume so, yes.

9      Q    And, also, there were times when she would

10  receive a claim and not enter it immediately that night.

11  She would wait until the next morning and enter that claim.

12  Correct?

13      A    That's possible.

14      Q    And that decision was up to her?

15      A    Yes.

16      Q    Okay.  Similarly, she -- Mrs. Brewster told us in

17  her deposition that she would handle incoming faxes for the

18  management team and also -- I think this is related, so I'm

19  going to handle them together -- coordinate with clients.

20  Am I accurate to say those can be lumped together,

21  coordination with clients and handling faxes that come in?

22      A    I don't know how to answer it.  I -- I wasn't

23  even aware they were getting that many faxes because I

24  don't -- anything that's being printed and mailed out,

25  anything that was being faxed and distributed was pretty

Page 39

1    all administrative that I for the most part was not

2    involved with and don't know the traffic and volume of

3    that.

4        Q    In terms of coordinating with clients, what she

5    meant -- and we've clarified this through her deposition --

6    was she'd get emails from clients with certain requests.

7        A    Yes.

8        Q    Were you aware that she was getting emails with

9    requests from clients?

10       A    Yes.

11       Q    Just as she had the discretion to address the

12   entry of claims, did she have the discretion to determine

13   that a request from a client was important, needed to be

14   handled immediately, or it could wait until the next

15   business day?

16       A    I would think she would have that discretion.

17       Q    Do you have an estimate of how much time she

18   spent on those -- the emails?  And I don't know if it was

19   emails or other types of coordination with clients,

20   requests from clients.  Was it all emails?  Was it phone

21   calls?  Do you know what it was?

22            MR. O'BRIEN:  Objection, form.

23       A    I didn't really, you know, pay that close

24   attention as far as being able to say how much time was

25   spent this, this, that, no.

Stephen Douglas Brewster                    1                    May 31, 2017

Page 42

1     A    Are you talking about outside of Debbie or what?

2     Q    I'm talking about including Debbie.  Would Debbie

3  have more experience, more ability to answer escalated

4  questions than Maria?

5              MR. O'BRIEN:  Objection, form.

6     A    It would depend on their area of expertise and

7  knowledge.  I really don't know what Maria -- I know she

8  had some other obligations than just phones.  I don't know

9  what that obligation was, but I would assume that she would

10  be the person of most knowledge for what that duty was.

11  Everybody kind of has their expertise, an area that they're

12  interacting and working in a lot and consistently that

13  they're going to have an area of expertise of knowledge

14  that -- that can answer questions more articulate than

15  someone else.

16     Q    And you used the word "assume."  Is the answer to

17  that last question based on personal knowledge of facts, or

18  it's based on just a guess?

19     A    And what question would that be referring to?

20     Q    The question was who had more experience to

21  answer those escalated questions.

22     A    Gosh, it would just depend on the question, but

23  Debbie and Maria for the most part in their environment are

24  very knowledgeable of what they're interacting with.

25     Q    Are you familiar with how much Mrs. Brewster was

Page 43

 1   being paid?

 2       A    I know it was somewhere around fifty, 50,000 a

 3   year.

 4       Q    It was a salary of 50,000 approximately?

 5       A    Approximately.

 6       Q    And as comparison to Maria, do you know whether

 7   Maria was hourly or salaried?

 8       A    I believe she was hourly.

 9       Q    And do you know approximately how much she was

10   getting paid?

11       A    Somewhere between 12 and 15, I would guess.

12       Q    Okay.  And comparing and contrasting Maria's

13   duties with Mrs. Brewster's, how did they contrast?  What

14   was the difference between what the two of them did?

15       A    Again, I really didn't -- didn't interact much

16   with Maria to know what all of her duties would be.  I

17   would -- I would be guessing if I --

18       Q    You don't --

19       A    -- elaborated more to that.

20       Q    Okay.  We talked about review of claims.  Are you

21   aware of whether or not Mrs. Brewster reviewed Magna Carta

22   claims?

23       A    No, I don't believe she did.

24       Q    And that's an affirmative, you don't believe she

25   did, not that you don't know?

Page 49

1   you know, I think in that -- the administrative supervisor

2   kind of title deal.  You know, we had a lot of titles.  We

3   needed titles.  And when you're representing yourself

4   before a carrier and client, there had to be specific

5   structure that looked good, so there was -- there was

6   always titles within our positions.

7        Q    So if I understand you, your differentiation from

8   an administrative assistant versus non-administrative

9   assistant is are you supervising anyone or not.

10       A    Yes, are you managing people, are you using, you

11   know --

12       Q    Okay.

13       A    -- your management skills versus inputting data

14   and just shuffling paperwork.

15       Q    Did Mrs. Brewster have to deal with confidential

16   information?

17       A    Everybody.  Our adjusters in the field are

18   dealing with confidential information.

19       Q    And she was required and did deal with that

20   confidential information with discretion?

21       A    Yes.  Every employee at every level to some

22   degree would have to -- to use discretion with confidential

23   information that we were touching daily from the carriers,

24   yes.

25       Q    Did Mrs. Brewster have to notify anyone when she

# Exhibit "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| DEBRA BREWSTER, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 6:16-cv-00170-RP-JCM |
| | § | |
| CUSTOM DATA SYSTEMS, INC., | § | |
| WARDLAW CLAIMS SERVICE, LLC, | § | |
| WILLIAM F. WARDLAW, | § | |
| MICHAEL N. WARDLAW, and | § | |
| JEFFREY A. KEAHEY | § | |
| Defendants. | § | JURY DEMANDED |

## <u>AFFIDAVIT OF CRYSTAL BELL</u>

Before me, the undersigned notary, on this day personally appeared, Crystal Bell, Director of Human Resources for the Defendant Wardlaw Entities in the above-referenced cause, known to me to the person whose name is subscribed hereto, and after being duly sworn on her oath, stated that he following facts, which are all within her personal knowledge, and are true and correct:

1.      "My name is Crystal Bell. I am the Director of Human Resources for the Defendant Wardlaw Entities in the above-referenced cause. I am over eighteen years of age and reside in McLennan County, Texas. I am fully competent to make this affidavit and have personal knowledge of the facts stated herein and they are all true and correct.

2.      "Plaintiff held several different positions during her tenure with Wardlaw. Due to the fact that she was a licensed adjuster, her capabilities were greater than others in similar positions. She performed desk adjusting functions for Defendants in that she was responsible for the following: answering specific policy questions, interpreting documentation and payments for insureds, communicating with clients on claim status, answering complicated prior loss

questions, coordinated various tasks for field managers, coordinate projects (for Steve Brewster specifically), escalations, complete control of Defendants' after-hours phone line for first notice of loss calls and escalations and general administrative functions regarding claims and the claims process.

3.      "Plaintiff was paid on a salary basis. Her salary was $44,568.00 from June 15, 2013 through June 30, 2014. Her salary was $45,576.00 from July 1, 2014 through June 30, 2015. Her salary was $47,016.00 from July 1, 2015 through her termination date.

4.      "In her complaint, Plaintiff alleges that she was an administrative assistant during her tenure with Wardlaw. Plaintiff was not an administrative assistant. Her duties required the exercise of discretion and independent judgment in matters of significance, and the relationship between Plaintiff's salary and the wages paid to other, nonexempt employees reflected the fact that Plaintiff's primary duty was the performance of exempt work.

5.      "For example, Dominique Terrase was a nonexempt employee whose primary duty was the performance of nonexempt work. She was paid hourly at a rate of $17.00. Sheila Gassaway and Jessica Gerik were nonexempt employees with the title of administrative assistant. Their primary duties were the performance of nonexempt work. They were paid hourly at a rate of $12.50 and $12.75, respectively. Several other employees were nonexempt because their primary duty was the performance of nonexempt work. Each was paid hourly at rates significantly lower than the compensation paid to Plaintiff."

Further, affiant saith not.



_____
Crystal Bell, Director of Human Resources


SWORN TO AND SUBSCRIBED BEFORE ME on the 15th day of June, 2017, to which I place my signature and official seal.

```
VANESSA M BUTLER
Notary Public, State of Texas
Comm. Expires 09-22-2019
Notary ID 13037905-3
```

_____
Notary Public, State of Texas

1.

# Exhibit "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| DEBRA BREWSTER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 6:16-cv-00170-RP-JCM |
| v. | § | |
| | § | |
| CUSTOM DATA SYSTEMS, INC., | § | |
| WARDLAW CLAIMS SERVICE, LLC, | § | |
| WILLIAM F. WARDLAW, | § | |
| MICHAEL N. WARDLAW, and | § | |
| JEFFREY A. KEAHEY | § | |
| | § | JURY DEMANDED |
| Defendants. | § | |

## DEFENDANTS' ANSWERS TO PLAINTIFF'S
## FIRST SET OF INTERROGATORIES

TO:   Plaintiff, Debra Brewster, by and through her attorneys of record, Kerry V. O'Brien *ko@obrienlawpc.com*, O'Brien Law Firm, 1011 Westlake Drive, Austin, TX 78746

COMES NOW, Custom Data Systems, Inc., Wardlaw Claims Service, LLC, William F. Wardlaw, Michael N. Wardlaw and Jeffrey A. Keahey ("Defendants"), by counsel, pursuant to the *Federal Rules of Civil Procedure*, hereby serve the following Objections, Answers to Plaintiff's First Set of Interrogatories upon Plaintiff.

Respectfully submitted,

SHEEHY LOVELACE & MAYFIELD PC

_____*/s/ Philip E. McCleery*_____
Philip E. McCleery
State Bar No. 13395000
*pmccleery@slmpc.com*
David M. Mathews
State Bar No. 24058211
*dmathews@slmpc.com*
510 N. Valley Mills Drive, Suite 500
Waco, TX 76710
254.772.8022 Telephone
254.772.9297 Facsimile
ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that on the 29th of November, 2016, a true and correct copy of the foregoing was served via electronic mail on all counsel of record.

_____/s/ Philip E. McCleery_____
Philip E. McCleery

**DEFENDANTS' OBJECTIONS AND ANSWERS TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES**

1.      Identify the individual responding to these interrogatories.

      **ANSWER:**
      Crystal Bell
      Director of Human Resources for Defendant Wardlaw Entities
      c/o Mr. Philip E. McCleery
      Sheehy Lovelace & Mayfield PC
      510 N. Valley Mills Drive, Suite 500
      Waco, TX 76710

2.      Describe Plaintiff's job duties from June 15, 2013 through her date of separation with Defendants.

      **ANSWER:**
      Plaintiff held several different positions during her tenure.  Due to the fact that she was a licensed adjuster, her capabilities were greater than others in similar positions.  She performed desk adjusting functions for Defendants in that she was responsible for the following: answering specific policy questions, interpreting documentation and payments for insureds, communicating with clients on claim status, answering complicated prior loss questions, coordinated various tasks for field managers, coordinate projects (for Steve Brewster specifically), escalations, complete control of Defendants' after-hours phone line for first notice of loss calls and escalations and general administrative functions regarding claims and the claims process.

3.      Describe Plaintiff's compensation plan and/or compensation rate for the period of June 15, 2013 through her date of separation with Defendants.  If Plaintiff's compensation rate changed at any point in time, identify the date of the change and the new compensation rate.

      **ANSWER:**
      06/15/13 - 06/30/14        Annual Salary        $44,568.00
      07/01/14 - 06/30/15        Annual Salary        $45,576.00
      07/01/15 - termination      Annual Salary        $47,016.00

4.      Identify the entity or entities with which Plaintiff was employed (on behalf of the Wardlaw Claims Service business operation) from June 15, 2013 through her date of separation with Custom Data Systems, Inc.  Also identify the beginning and ending dates of Plaintiff's employment with such entities.

      **ANSWER:**
      Custom Data Systems, Inc.
      September 1, 2008 until May 15, 2016

5.     If Plaintiff was assigned a cell phone, responsible for a cell phone or otherwise took home a cell phone, where such cell phone was the property of an entity operating as part of the Wardlaw Claims Service operation, identify:

     a.     The phone number assigned to that cell phone between June 15,2013 through June 1, 2016;

     b.     The carrier for that cell phone between June 15, 2013 through June 1, 2016;

     c.     The registered owner for that cell phone and/or cell phone account for the cell phone.

**ANSWER:**

     a.     254.644.8288

     b.     Verizon Wireless

     c.     Wardlaw Claims Service

6.     Identify the "workweek" used by Defendants from June 15, 2013 through the present to determine its overtime obligations for employees not exempt from the overtime provisions of the Fair Labor Standards Act.

**ANSWER:**

Sunday through Saturday

## VERIFICATION

THE STATE OF TEXAS          §

                            §                    KNOW ALL MEN BY THESE PRESENTS

COUNTY OF    MCLENNAN        §

    Crystal Bell, being first duly sworn, upon her oath, deposes and says that she is the Director of Human Resources for Defendant Wardlaw Entities; that she has read the above and foregoing Answers to Plaintiff's First Set of Interrogatories to Defendant and knows the contents thereof; and that said Answers are true and correct to the best of her knowledge, information and belief.



    Crystal Bell, Director of Human Resources

    SUBSCRIBED AND SWORN TO BEFORE ME Crystal Bell this 15th day of June, 2017.

VANESSA M BUTLER
Notary Public, State of Texas
Comm. Expires 09-22-2019
Notary ID 13037905-3

Notary Public, State of Texas

My Commission Expires:  09-22-2019

# Exhibit "E"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

DEBRA BREWSTER,                    §
                                   §
          Plaintiff,               §
                                   §
VS.                                §    CIVIL ACTION NO.
                                   §    6:16-cv-00170-RP-JCM
                                   §
CUSTOM DATA SYSTEMS, INC.,         §
WARDLAW CLAIMS SERVICE, LLC,       §
WILLIAM F. WARDLAW,                §
MICHAEL N. WARDLAW,                §
and JEFFREY A. KEAHEY,             §
                                   §
          Defendants.              §    JURY DEMANDED


-----------------------------------------------------------

ORAL DEPOSITION OF

JEFFREY KEAHEY

JUNE 7, 2017

VOLUME 1 OF 1

-----------------------------------------------------------


ORAL DEPOSITION OF JEFFREY KEAHEY, produced as a

witness at the instance of the Plaintiff and duly sworn, was

taken in the above-styled and numbered cause on the 7th day

of June, 2017, from 10:05 a.m. to 1:22 p.m. before Terri L.

Edwards, Certified Shorthand Reporter in and for the State

of Texas, reported by machine shorthand at the  law offices

of Sheehy, Lovelace & Mayfield, P.C., 510 North Valley Mills

Drive, Suite 500, Waco, Texas 76710, pursuant to the Federal

Page 2

1   Rules of Civil Procedure and the provisions stated on the

2   record or attached hereto.

3

4                   A P P E A R A N C E S

5   FOR THE PLAINTIFF:
        MR. KERRY V. O'BRIEN
6       O'BRIEN LAW FIRM
        1011 Westlake Drive
7       Austin, Texas 78746
        Telephone: 512.410.1960
8       Fax: 512.410.6171
        Email: ko@obrienlawpc.com
9
    FOR THE DEFENDANTS:
10      MR. PHILIP E. McCLEERY
        SHEEHY, LOVELACE & MAYFIELD, P.C.
11      510 North Valley Mills Drive
        Suite 500
12      Waco, Texas 76710
        Telephone: 254.772.8022
13      Fax: 254.772.9297
        Email: pmccleery@slmpc.com
14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                               INDEX

2                                                                 Page

3   Appearances ........................................   2

4   JEFFREY KEAHEY
        Examination by Mr. O'Brien .....................   4
5       Examination by Mr. McCleery ....................  122
        Further Examination by Mr. O'Brien ............. 127
6
    Changes and Signature ............................. 132
7
    Court Reporter's Certificate ...................... 134
8

9

10

11                              EXHIBITS

12  NO. IDENTIFICATION

13   2   Defendants' Answers to Plaintiff's First Set
         of Interrogatories .............................   4
14   3   Call Report ....................................   4
     4   Claims Entry Log ...............................   4
15   5   Email Summary Log ..............................   4

16

17

18

19

20

21

22

23

24

25

```
                                                          Page 4
   1                  (All parties present have hereby waived the

   2                  necessity of the reading of the statements

   3                  by the deposition officer as required by

   4                  Rule 30(b)(5)

   5                  (Exhibit Nos. 2-5 marked)

   6                          JEFFREY KEAHEY,

   7     having been first duly sworn, testified as follows:

   8                          EXAMINATION

   9     BY MR. O'BRIEN:

  10          Q    Good morning, Mr. Keahey.  We've met before.

  11          A    Yes.

  12          Q    I'm Kerry O'Brien, attorney for Debra Brewster in

  13     this case.  This is a deposition.  I know that you've sat

  14     in on a couple of depositions recently.  Have you yourself

  15     ever actually participated in any deposition as the one

  16     answering the questions?

  17          A    No, sir.

  18          Q    There's a couple of ground rules that I'd like to

  19     go over that I don't think were necessarily gone over in

  20     some of the prior depositions that you've seen in another

  21     city.  But some of the things to keep in mind when we're

  22     doing the deposition is if you are answering a question

  23     with "yes" or "no," I ask that you use the word "yes" or

  24     "no" for the sake of the court reporter -- can we do

  25     that? --
```

Page 39

 1                    MR. McCLEERY:  Sure.

 2                    MR. O'BRIEN:  Five-minutes?

 3                    (Recess from 10:51 a.m. to 11:01 a.m.)

 4          Q     (BY MR. O'BRIEN)  What were Ms. Brewster's job

 5     duties at least as of her last three years of employment?

 6          A     Debbie was in -- her primary job function was to

 7     handle escalated calls, customer concerns, convey

 8     information to customers that might have questions or

 9     issues.  She coordinated with our clients to set up data

10     feeds to and from.  She would answer questions for our

11     clients.  She would offer support to our field management

12     team.  She would define systems by which we would receive

13     and send data to and from clients and then pass that on to

14     IT for automation or a manual team, data entry team.  She

15     did some data entry.  She answered FNOL phone calls, first

16     notice of loss.  That's all I can remember right off the

17     top of my head.

18          Q     And do you know that from observing her, or just

19     is that how you know that those were her job duties?

20          A     Yeah, I know that those were her job duties.

21     If -- when things would escalate beyond her, then I would

22     become aware.  I would see the client communications that

23     were occurring, probably not in its entirety but at least

24     some.  I mean, she did -- she did quite a number of things.

25     I don't know.  I couldn't -- I don't think anyone could

Page 46

    1       Q    Was it automatic in that respect?

    2       A    They would have to log their time.

    3       Q    So Wardlaw would rely on their reports of time

    4   worked?

    5       A    Correct.

    6       Q    And how is she currently paid as a desk adjuster?

    7   Hourly or salary --

    8       A    She --

    9       Q    -- or other?

   10       A    She is -- how is she paid?  She's presently

   11   hourly.

   12       Q    Is she still at Wardlaw HQ, headquarters?

   13       A    Yes.

   14       Q    I assume that when she's been paid hourly, she's

   15   been paid hourly as a W-2 employee, correct?

   16       A    Correct.

   17       Q    And she's paid -- if she works over 40 hours,

   18   Wardlaw pays her overtime, correct?

   19       A    Correct.

   20       Q    You said she was an inbound customer service rep

   21   for the escalation team, correct?

   22       A    Correct.

   23       Q    As of May 2016 who was considered the escalation

   24   team?

   25       A    There's tiers.  Maria, Sarah, and Sylvia were the

Page 47

1    first line of defense.  They took the majority of all the

2    calls that came in.  If it was beyond their capacity, they

3    would escalate that to Debbie and then -- and/or a manager.

4         Q    When you say "if it was beyond their capacity,"

5    are you talking about volume?

6         A    Well, there was times where volume would roll out

7    to everyone.  I mean, I'm the last resort on that call

8    center, so I'll get those calls if it rolls and rolls and

9    rolls.  But if it was beyond her capacity, Maria's

10   capacity, if we're talking about her still, if it was

11   something where coverage is in question or specific details

12   about an estimate were needing to be conveyed, those would

13   go to Debbie.  Debbie had more advanced knowledge of

14   reading and conveying estimates and coverage

15   determinations.  Debbie was a licensed insurance adjuster,

16   so those -- those questions that we deemed relevant to have

17   a licensed adjuster on would go to Debbie.

18        Q    She would handle some of the more advanced or

19   tougher questions?

20        A    Absolutely.

21        Q    Okay.  And that was to provide information to

22   whoever was calling, correct?

23        A    Correct.

24        Q    And you'd said that -- in asking what her job

25   duties were, you used the phrase "clients" twice.  You'd

Page 48

1    said that she coordinated with clients to set up data feeds

2    and answer questions for clients.  And I want to be clear

3    about this.  When you use the word "clients," who are you

4    referring to?

5        A    I'm referring to staff members of our various

6    insurance company clients, not -- and I will use "clients"

7    as staff of insurance companies, and I will use "customers"

8    and/or "insureds" when I'm talking about the owner of the

9    insurance policy --

10       Q    Okay.

11       A    -- the designee of the policy.

12       Q    So the inbound calls that we're talking about

13   here as far as escalation, those are never policyholders?

14       A    They are both policyholders and insurance

15   clients.

16       Q    When would a policyholder contact the escalation

17   team directly?  What kind of --

18       A    Those are --

19       Q    -- circumstances?

20       A    -- going to come in --  I'm sorry.  I didn't mean

21   to overstep.

22       Q    No.

23       A    Those calls can come in for any number of reasons

24   from the policyholders.  Most frequently the first line of

25   defense is going to handle "I don't know who my adjuster

Page 49

1    is."  They're going to say, "Your adjuster is this person.

2    Here's their phone number."  Those are -- those are a lot

3    of calls that come in.  We get calls from customers that

4    will say, "I got my estimate in the mail.  I don't

5    understand 'recoverable' and 'nonrecoverable'

6    depreciation."  That's going to be a more advanced question

7    that Maria could handle in some aspects.  She was -- later

8    in her employment with us did become licensed.  But those

9    typically would go to Debbie to read and refer back to the

10   adjuster's notes and then convey that information in a way

11   that the customer would understand and be able to make

12   decisions about how to proceed to the next step.

13       Q    And for these clients or policyholders to reach

14   the escalation team, what number would they be calling?

15       A    We have an 800 number.  There are several

16   numbers, but the primary is a 1-800 number that we give out

17   to all of the policyholders and our insurance company

18   clients.  We call it the claims line.

19       Q    Okay.  So it's essentially a general number for

20   claims questions?

21       A    Correct.

22       Q    And when that call comes in, can you -- and this

23   is, of course, as of May of 2016.  When that call would

24   come in, what would be the pathway of that call?  Who would

25   initially answer that call?

Page 50

1      A     So when the call comes in, it would ring --

2      Q     Assuming everybody's available.

3      A     Right.  Assuming everybody's available, the call

4   would come, and it would ring everybody through that area

5   of the call center escalation teams:  Maria, Sarah, Sylvia.

6   We had other people in and out of that operation during the

7   time.  They were to answer that call on the first ring.

8   That was their -- that was our goal, was to have them

9   answer on the first ring.  Debbie would pick up if it got

10  to a third ring or -- or if she just had the time, I guess,

11  she could jump in.  But she was -- because she was that

12  last line of defense in handling escalations, she was

13  supposed to pick up on the third ring, I think is what we

14  discussed.

15     Q     So when somebody would call that toll-free claims

16  number, they would get somebody in the escalation

17  department if everybody was available?

18     A     Correct.

19     Q     Did the individuals that were on the escalation

20  team -- did they have the authority to take any actions

21  with respect to the claim apart from giving information?

22     A     Yes.

23     Q     Okay.  What actions could they take?

24     A     They could reopen a claim to an adjuster,

25  reassign a claim.  They could work with management to

Page 51

1    coordinate, you know, further contact with a contractor or

2    a public adjuster or an attorney.

3        Q    And that authority was held by Maria, Sarah, and

4    Sylvia?

5        A    To some extent by Maria.  If it was a complicated

6    situation, they would've probably been in consultation with

7    Debbie and/or a manager if Debbie wasn't available to make

8    those determinations.

9        Q    And you said Sarah was part of the escalation

10   team.  Is this Sarah Martin or a different Sarah?

11       A    This is a different Sarah.  This is Sarah Perez.

12       Q    Are all those three individuals still employed by

13   Wardlaw?

14       A    Yes.

15       Q    And Maria, Sarah, and Sylvia, I presume, are paid

16   on an hourly basis doing this work on the escalation team?

17       A    Correct.

18       Q    Okay.  And so those areas of authority that they

19   had, what additional areas of authority did Debbie Brewster

20   have that these three individuals did not?

21       A    Debbie defined a lot of processes for us.  Debbie

22   had access directly to our clients' computer systems.  And,

23   as we were creating a new client, she would develop the

24   processes and procedures to move the data back and forth,

25   and then she would train the rest of the team on what that

Page 117

1    and how we report and handle that data.

2         Q    And apart from those projects, you don't have any

3    specific knowledge on other projects she worked on?

4         A    No, not that I can think of right now.

5         Q    Were Maria, Sarah, and Sylvia involved in

6    escalations?

7         A    Yes.

8         Q    And the fact that Ms. Brewster had, it says,

9    complete control of Defendants' after-hours phone line,

10   "complete control" simply means that all those after-hours

11   calls rolled over to her cell phone, correct?

12        A    And she would've made the decision as to what was

13   and was not a priority.

14             MR. O'BRIEN:   Objection, nonresponsive after

15   the first word of that answer.

16        Q    (BY MR. O'BRIEN)   So after hours, were those

17   calls, as a matter of course, different than calls that

18   might come in during the day, the business hours?   Is there

19   anything unique about those calls?

20        A    They were a little bit different.

21        Q    How?

22        A    Because you didn't have the client

23   communications.   You weren't -- all you were dealing with

24   were focused specific on the insured.   And so their --

25   their needs are different than what you might just get on a

Page 118

 1   daily basis.  We talked to public adjusters and contractors

 2   and our insurance company clients throughout the course of

 3   the day.  Those typically stopped after hours, and it's

 4   just more of the insureds.

 5        Q    Is that inherently a -- considered to be a more

 6   complicated call than an escalation team member might take

 7   during a business hour?

 8        A    It could very well be.  If it was a supplement

 9   request, that would -- could very well be a more

10   complicated call.

11        Q    It could also be what you might consider to be a

12   standard incoming call, correct?

13        A    A supplemental request I wouldn't call standard.

14        Q    No.  What I mean is just other calls that would

15   come in after hours.

16        A    They would -- yeah, they would tend to be more

17   standard calls.  You always had unique situations after

18   hours.  Those were -- a lot of times you -- after hours

19   you'd get a call that, you know, "My adjuster didn't show

20   up for my appointment at six o'clock, and I just got off of

21   work," or, you know, "I got home, checked my mail, and I

22   got this estimate in the mail and it doesn't make sense."

23   I mean, you get those same calls during the day, but they

24   just tend to gravitate to different subjects after hours.

25        Q    And in these after-hours calls when she would

Page 119

1    take these calls, Ms. Brewster didn't have the authority to

2    deny a claim as it came in, did she?

3        A    No, she wouldn't have been in a position to deny

4    a claim at that point.  She could explain a denial and she

5    could go into detail explaining the endorsement that

6    created the cause for the denial or the policy limitation

7    that created the cause for the denial.

8        Q    The same thing that the other escalation team

9    members would do during the daytime if they had the

10   knowledge to be able to answer that type of question?

11       A    If they had the knowledge, correct.

12       Q    All right.  And "general administrative functions

13   regarding claims in the claims process," what does that

14   mean to you?

15       A    She would make notes into our claim system into

16   the claims file.  Her name appeared relatively frequently

17   in more complex or messy -- what I would consider a messy

18   claim, one that has lots of moving parts, lots of people

19   involved, you'd see a considerable number of notes from

20   Debbie on.  She would take ownership of a lot of issues

21   that would arise and see them through.

22       Q    And that's what you refer to as general

23   administrative functions?

24       A    That's -- that's -- in -- in this particular

25   case, yes.